# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AILEAF ASHFORD,                    )
                                   )        Civil Action No. 14-cv-1718
                Plaintiff,         )
                                   )        United States Magistrate Judge
        v.                         )        Cynthia Reed Eddy
                                   )
ROBERT HAWKINBERRY, et al.,        )
                                   )
                Defendants.        )


## MEMORANDUM OPINION[1]

CYNTHIA REED EDDY, United States Magistrate Judge

## I.  INTRODUCTION

Plaintiff Aileaf Ashford ("Plaintiff") is a state prisoner committed to the custody of the Pennsylvania Department of Corrections ("DOC") and currently confined at the State Correctional Institution in Marienville, Pennsylvania ("SCI-Forest").  Prior to being transferred to SCI-Forest, he was incarcerated at the State Correctional Institution in Labelle, Pennsylvania ("SCI-Fayette").  On December 19, 2014, Plaintiff commenced this civil action by suing nineteen DOC officials and agents who were employed at SCI-Fayette in 2014.[2]  Plaintiff claims that the named officials and agents (hereafter, "Defendants") violated his rights under federal and state law during the course of his incarceration at SCI-Fayette.

---

[1] All parties have consented to jurisdiction before a United States Magistrate Judge; therefore, the Court has the authority to decide dispositive motions and to eventually enter final judgment.  *See* 28 U.S.C. §636, *et seq.*

[2] The original named defendants were:  "Robert Hawkinberry"; "Lt. Parker"; "Captain Workman"; "Lt. Lowther"; "Sgt. Richter"; "Sgt. Pletcher"; "Sgt. Friend"; "Ashley Cotton"; "C.O. Dongilli"; "C.O. Pellis"; "C.O. Egros"; "C.O. DiSalva"; "C.O. Garland"; "C.O. Haley"; "C.O. Newman"; "C.O. McKnight"; "Sgt. Brian Tanner"; "Brian Coleman, Superintendent"; and "John Doe, Shift Commander on 1/30/14."  On September 4, 2015, "Eric B. Porter" was substituted as a defendant in his capacity as administrator of the estate of Defendant Braden McKnight, and McKnight was terminated as a party to this case.  *See* ECF No. 52.  On September 21, 2015, "Cpt. Forte" was substituted for the John Doe defendant.  *See* ECF No. 58.

Presently pending before the Court are cross-motions for summary judgment filed by Plaintiff [ECF No. 128] and Defendants [ECF No. 136]. For the reasons that follow, the Plaintiff's motion for summary judgment will be denied. Defendants' cross-motions for summary judgment will be granted in part and denied in part. In addition, Plaintiff's Eighth Amendment claim predicated on the alleged denial of exercise will be dismissed pursuant to the directives of 28 U.S.C. §§1915(e)(2)(B) and 1915a.

## II. BACKGROUND

### A. Factual Background

The events giving rise to this lawsuit occurred in 2014 while Plaintiff was housed in the Restrictive Housing Unit ("RHU") at SCI-Fayette. As a general matter, Plaintiff contends that certain members of the corrections staff and supervisors at SCI-Fayette subjected him to unsafe or unsanitary living conditions and retaliated against him when he filed grievances about the conditions of his confinement. Defendants deny any wrongdoing and offer an alternative version of the relevant events. The parties' respective statements of fact are set forth below.

#### 1. *Plaintiff's Version of Events*

Plaintiff's statement of the facts comes largely from his own sworn declaration (ECF No. 130), copies of his grievances and request slips (ECF Nos. 131-6, 131-9 through 131-12, and 131-19 through 131-21), some corroborating statements from other inmates (ECF Nos. 131-4, 131-7, 131-8, and 131-13 through 131-16), and other institutional or miscellaneous documents (ECF Nos. 131-1 through 131-3, 131-5, 131-17, 131-18, and 131-22 through 131-25). Construed in the light most favorable to Plaintiff, this evidence establishes the following.

On the morning of January 30, 2014, Plaintiff was escorted to the RHU yard of SCI-Fayette by Sgt. Richter. (ECF No. 129, ¶1; ECF No. 135, ¶1.) At the time, the temperature was

below freezing and there was snow and ice in the RHU yard cages.  (ECF No. 129, ¶2; ECF No. 135, ¶2; ECF No. ECF No. 130, ¶2.)  As shift commander, Captain Forte had the authority to cancel yard activity.  (ECF No. 130, ¶4; ECF No. 131-1.)  Based on the DOC's class code system, Lt. Lowther had sole authority and responsibility to cancel yard activities in the event that a superior officer, like Captain Forte, was not available.  (ECF No. 130 ¶5; ECF No. 131-2.)

"Despite [Plaintiff's] pleas to Defendant Richter to be taken back inside [and] Defendant Lowther's acknowledgment that the yard should be cancelled," Richter and Lowther left Plaintiff in below-freezing conditions for nearly ninety minutes.  (ECF No. 130, ¶2; ECF No. 131-4.)  While in the RHU yard, Plaintiff slipped on an icy patch and injured his knee and back.  (ECF NO. 130, ¶3.)  He was seen in the medical department the following day, at which time he was diagnosed with muscle strain and a sprained knee.  (ECF No. 129, ¶12; ECF No. 135, ¶12; ECF No. 131-5.)

Thereafter, Plaintiff filed a grievance ("Grievance #497654") concerning his slip and fall in the RHU yard.  (ECF No. 131-6.)  The grievance was placed in a lockbox in Plaintiff's pod on the morning of February 18, 2014.  (ECF No. 130, ¶11.)

Later that morning, the prison's grievance clerk, Ashley Cotton, was escorted by Corrections Officer Dongilli to retrieve grievances from the lockbox.  (ECF No. 130, ¶12; ECF No. 131-4.)  According to Plaintiff, Cotton allowed Dongilli to read his grievance.  (*Id.*) Approximately fifteen or thirty minutes later, C.O. Halley[3] recited the contents of Plaintiff's grievance and made remarks to the effect that Plaintiff should not have filed a grievance and "would not be going to the yard for a while."  (ECF No. 130, ¶¶13, 45.)

---

[3] C.O. Halley is incorrectly identified on the Court's docket as "C.O. Haley."  For purposes of this opinion, the Court will refer to C.O. Halley by his correct surname.

The following morning, February 19, 2014, Sgt. Richter walked around Plaintiff's pod to take the list of names for the yard. (ECF No. 130, ¶14.) When Richter approached Plaintiff's cell, he informed Plaintiff that he "might as well lay [sic] down because [he] was not going outside for a while." (ECF No. 130, ¶¶14, 46.; *see also* ECF No. 131-4; ECF No. 131-7; ECF No. 131-8.) Shortly thereafter, Sgt. Richter & Lt. Hawkinberry began conducting yard activity. According to Plaintiff, Hawkinberry informed him that he "would not be going out since [he] put a grievance in" and he "might hurt [his] back again." (ECF No. 130, ¶¶14, 47; ECF No. 131-4; ECF No. 131-7; ECF No. 131-8.) Hawkinberry told another inmate, Timothy Gaines, that he also would not be going out to the yard because he was listed as a witness in Plaintiff's grievance. (ECF No. 130, ¶14; ECF No. 131-4.) Plaintiff contends that Richter, Hawkinberry, or other officers repeated this process for the next twenty-one days, denying him yard activity until March 11, 2014. (ECF No. 130, ¶¶16, 48.)

Meanwhile, on February 19, 2014, Plaintiff had filed Grievance #498217, in which he complained of the allegedly improper disclosure of his prior grievance (Grievance #497654) and the allegedly retaliatory denial of his yard privileges. (ECF No. 131-9.) That same week, Plaintiff's "Star" magazines – which usually arrived on a weekly basis -- stopped being delivered to his cell. (ECF No. 130, ¶¶19, 50-53.) On March 13, 2014, Plaintiff wrote a "request slip" to the prison mail room to inquire about his magazines. (ECF. No. 130, ¶¶20, 52.) On March 18, 2014, the mail room responded that all magazines they had received had been sent to the inmates. (ECF No. 130, ¶¶20, 52; ECF No. 131-10 at 6.) Plaintiff also wrote to the magazine company, which confirmed that all of his "Star" magazines had been sent to the Institution and none had been returned as non-deliverable. (ECF No. 130, ¶¶20-21, 52; ECF No. 131-10 at 7.)

Plaintiff states that, for the seven-week period between February 19 and April 8, 2014, he discussed the missing magazines with nearly every officer who passed out mail, including Sgt. Tanner (whom Plaintiff claims to have spoken with a few times a week) and Captain Workman (whom Plaintiff claims to have spoken with twice).  (ECF No. 130, ¶¶22, 51.)  After "a lot of prodding," Plaintiff began receiving his magazines again on April 8, 2014.  (*Id.* ¶¶22, 53.)

On May 1, 2014, after using his toilet to defecate, Plaintiff discovered that his toilet would not flush.  Plaintiff reported the problem to a "staff member" that night and was informed that he should notify Lt. Hawkinberry.  (ECF No. 130, ¶¶ 30, 62-63.)

The next morning, Plaintiff sent a request slip to Hawkinberry about the issue, but he received no reply.  (ECF No. 130, ¶¶31, 64; ECF No. 131-12 at 9.)  That same day, Plaintiff notified numerous prison staff members about the problem, including (among others) C.O. McKnight and Sgt. Pletcher.  McKnight attempted to reset the toilet, but he was unsuccessful.  (ECF No. 130, ¶¶32, 64.)

For the next several days, Plaintiff continued to seek assistance with his nonfunctioning toilet.  (*Id.* ¶32.)  On May 3, 2014, Plaintiff informed McKnight, Pletcher, and C.O. DiSalva of the ongoing problem, among others.  (ECF No. 130, ¶¶32, 65.)  On May 4, 2014, he spoke to C.O. Egros, C.O. Pellis, Sgt. Friend and C.O. DiSalva.  (*Id.* ¶¶32, 66.)  Plaintiff contends that none of these individuals fixed the problem, and all of them refused to move him to another cell, even though empty cells were available.  (*Id.* ¶¶32, 65-66.)  Plaintiff also claims that Pellis and Egros both teased him about the foul odor coming from his cell, and Egros remarked that Plaintiff should "file a grievance like I always do."  (*Id.* ¶¶33; *see also* ECF No. 130, ¶66; ECF No. 131-13; ECF No. 131-14; ECF No. 131-15; ECF No. 131-16.)

On May 5, 2014, Plaintiff informed C.O. Garland, C.O. Dongilli, and Sgt. Richter about the issue with his toilet.  (ECF No. 130, ¶¶32, 67.)  Plaintiff was informed that a work order would be put in, but none of the staff members would move Plaintiff to an empty cell in the meantime.  (ECF No. 130, ¶¶32, 67; ECF No. 131-12 at 10.)  That same day, Plaintiff sent a request slip to Captain Workman, stating:

> I have been trying to remain patient while seeking to get my toilet fixed (which has not flushed since Thursday 5-1-14). There has been fecal matter in my toilet since then.  The stench is horrible and I've been forced to limit my intake of food & water since Saturday, 5-3-14, to limit my use of the toilet facilities, which hasn't been too pleasant of a feeling.  And to top it off, some officers thought it was amusing. . . .

(ECF No. 131-12 at 10.)  Plaintiff then listed a number of correctional officers whom he had spoken with about the issue, noting that "[i]t would have been simple to move me to one of the five open cells on the pod."  (*Id.*)

That same day, Plaintiff filed another grievance ("Grievance #508476") concerning the ongoing problems with his toilet and the allegedly retaliatory treatment he had received from staff.  (ECF No. 131-12 at 2-3.)  In his grievance, Plaintiff stated that his nonfunctioning toilet was now filled with excrement, causing him to limit his intake of food and fluids in order to cut down on his use of the toilet.  He complained that his environment was becoming "unbearable" and that bugs were now flying around his cell because of the stench.  (*Id.*)  In fact, Plaintiff claims that C.O. Garland made jokes about the odor coming from Plaintiff's cell and the bugs it was attracting.  (ECF No. 130, ¶¶33, 68.)

On May 6, 2014, Plaintiff's toilet was finally fixed.  Included in the evidentiary record is a work order request that Sgt. Richter submitted, and Cpt. Workman approved, on May 5, 2014. The document indicates that requested repair was classified as a priority code number "4," (ECF

No. 131-18), which signifies "routine" general repairs and preventive maintenance. (ECF No. 131-17.) Other relevant maintenance codes include:

> #1 Emergency – Security repairs – immediate; overtime may be authorized;
>
> #2 Immediate – Health and Safety repairs – work that needs to be addressed immediately; overtime may be authorized;
>
> #3 Urgent – repairs that need to be address the next schedule[d] work day. Parts or materials my need to be ordered; . . . .

(ECF No. 131-17 at 4.) Plaintiff maintains that the repair of his toilet should have been classified as at least "urgent." (ECF No. 130, ¶36.)

Even after his toilet was fixed, staff members refused to provide him cleaning supplies, thereby "forcing [him] to cohabitate with the accumulated vermin until Saturday, May 10, 2014, the day that cell-cleaning commenced." (ECF No. 130, ¶68.) During that same time period, C.O. DiSalva allegedly came by his cell and stated that he had gotten "chewed out" by Parker, the investigating grievance officer, over the manner in which the toilet incident had been handled. (ECF No. 130, ¶69.)

Plaintiff asserts that, following his filing of Grievance #508476, other acts of retaliation ensued. On May 5, 2014, the same day that Grievance #508476 was filed, Plaintiff sent his copy of Grievance #498217 (along with attachments) to the prison library for copying. (ECF No. 130, ¶39.) Plaintiff requested a "copy-return date" of May 8, 2014, because his deadline for filing an appeal to the central office was May 21, 2014. (*Id.* ¶¶39, 82-83.) When the library cart came to his pod on May 8, however, Plaintiff did not receive his copies. (*Id.* ¶40.) Plaintiff's contemporaneous account of the incident indicates that he was informed the books and copies would be handed out the next day. (*See* ECF No. 131-19 at 2.)

On Friday, May 9, 2014, Plaintiff asked Officer Costello about his copies from the library. Costello told Plaintiff that Officers Halley and Garland would be making the deliveries

to Plaintiff's pod. (ECF No. 130, ¶84; ECF No. 131-19 at 2.) When Plaintiff asked Halley and Garland for his copies, they allegedly told him that the papers were not on the cart. (ECF No. 130, ¶84.) Plaintiff later spoke to Officers Newman and McKnight, who similarly stated that Plaintiff's copies were not on the cart. (*Id.* ¶85.) On the morning of May 10, Plaintiff spoke to an inmate worker who allegedly confirmed that he had seen Plaintiff's copies on the cart. (*Id.* ¶86.) According to Plaintiff, the inmate led Newman out to where the cart had been but returned moments later, stating that the cart had been moved. (*Id.*) Plaintiff then approached Sgt. Pletcher about the matter and was informed that the only books that were on the cart were for inmates in different pods. (*Id.*; ECF No. 131-19 at 2-3.) Based on these events, Plaintiff filed Grievance #509029, in which he claimed that "[t]his confiscation of legal materials is the latest retalliatory [sic] act along a growing list of acts." (ECF No. 131-19 at 3.)

As of May 11, 2014, Plaintiff still had not received the copies he was waiting for. He discussed the matter with Lt. Hawkinberry. According to Plaintiff, Hawkinberry informed him that the library cart had been taken back to the library, but he (Lt. Hawkinberry) would retrieve Plaintiff's copies for him the following day (May 12). (ECF No. 130, ¶87.)

Plaintiff states that Hawkinberry never followed through on his promise to retrieve the missing copies of Grievance #498217 on May 12. Instead, Hawkinberry called Plaintiff to his office on May 17, 2014, at which time he allegedly attempted to persuade Plaintiff into withdrawing a separate grievance (Grievance #508476) by offering to move a friend of Plaintiff's into his pod if the grievance were withdrawn. (ECF No. 130, ¶41.) Plaintiff declined the offer but, before leaving Hawkinberry's office, he inquired about his missing copies of Grievance #498217. According to Plaintiff, Hawkinberry indicated that he would get Plaintiff a copy of that grievance for his appeal. (*Id.*)

Two days later, on May 19, 2014, Hawkinberry came to Plaintiff's cell door and again attempted to persuade him to withdraw Grievance #508476. (ECF No. 130, ¶42.) Plaintiff refused to do. (*Id.*)

On May 23, 2014, Plaintiff was again summoned to Hawkinberry's office. (ECF No. 130, ¶42.) According to Plaintiff, Hawkinberry gave him an ultimatum and told him that if he did not withdraw his grievance, he would not get his missing papers and Hawkinberry would make his stay in the RHU difficult. (*Id.*)

Five days later, Parker submitted an "Initial Review Response" to Grievance #508476, in which he deemed the grievance frivolous. (ECF No. 131-12 at 4.) In relevant part, Parker stated the following:

> After investigation of your grievance I have spoken to the involved staff members who state that you never spoke to anyone about you [sic] toilet not working on the dates that you put in your grievance. You did speak to an officer about resetting your toilet which was reset and worked properly. Officer Egros deny's [sic] making any unprofessional statements toward you. If you have any problems in the future with your plumbing please feel free to ask the Officers to speak with me. . . .

(*Id.*)

Plaintiff appealed Parker's decision to Superintendent Coleman, claiming that Parker's response was merely an attempt to cover-up misconduct by the prison staff. (ECF No. 13-12 at 5.) Although Coleman did not find the grievance to be frivolous, he upheld Parker's response, stating (in part):

> I spoke with Lt. Parker concerning your grievance and he stated that he interviewed all staff that you mention in your grievance, with the exception of Sgt. Richter, and they all stated that you never spoke to anyone about your toilet not working on the dates that you provide in your grievance. He inadvertently did not interview Sgt. Richter due to the volume of staff you mentioned in your grievance. He reported that you did speak to an officer about resetting your toilet and it was reset and working properly. In your grievance/appeal you claim that Officer Ergos, Officer Pellis, and Officer Garland made comments to you concerning the alleged situation. Lt. Parker interviewed the officers and they

deny your allegations. In your appeal you state "If my toilet was reset and working properly, then why would the plumbers have to come on 5-6-14 and spend nearly twenty minutes fixing my toilet." I contacted CFMM3 Hostovich and he provided me with a copy of the work order that was submitted by Sgt. Richter on 5-5-14. Therefore, I spoke to Sgt. Richter and he stated that he submits a work order as soon as these types of incidents are brought to his attention. It was bought to his attention on 5-5-14 and as you state in your appeal, it was fixed by the plumbers on 5-6-14. As Lt. Parker stated to you, if you have any problems in the future with your plumbing, please feel free to ask the officers to speak with him.

(ECF No. 131-12 at 6.) Plaintiff views Coleman's response as an attempt "to fix [and] fill the holes in Defendant Parker's story" by "providing Defendant Parker with falsified excuses for why his report did not match the facts." (ECF No. 130, ¶73.)

In an effort to further investigate the incident with his toilet, Plaintiff sought to obtain a written statement from McKnight stating the reason why McKnight was not able to fix the toilet and why Sgt. Pletcher would not allow Plaintiff to be moved from his cell pending a repair. According to Plaintiff, McKnight would not sign a written statement without talking to Parker first. (ECF No. 130, ¶74; ECF No. 131-21 at 1.) Plaintiff send a second written request to McKnight seeking to ascertain why his toilet could not be fixed, whom McKnight informed about the problem, and the reason why Plaintiff was not moved to a different cell. (ECF No. 131-21 at 3.) The paper was returned to Plaintiff without any written response and, when Plaintiff later showed it to McKnight, McKnight claimed he had never received it. (ECF No. 130, ¶76; ECF No. 131-21 at 3.) According to Plaintiff, McKnight then took physical possession of the written request slip and said that he would supply an answer; he never did, however, and later informed Plaintiff that Parker told him not to return the paper. (*Id.*)

Plaintiff claims to have sent a request slip to "every other person that [he] spoke to about the toilet," seeking to find out whom they notified. (ECF No. 130, ¶77.) Some of the request slips were sent back unanswered and others were not sent back at all. (*Id.*)

Meanwhile, on May 26, 2014, Plaintiff had written to the prison librarian, to inquire about his copies. Plaintiff claims that the librarian acknowledged sending them to Plaintiff's block during the week of May 5, 2014. (ECF No. 130, ¶90.)

On June 2, 2014, after Plaintiff's deadline had passed for appealing Grievance #498217 to the Central Office, Hawkinberry personally delivered a printed copy of the grievance papers to Plaintiff. (ECF No. 130, ¶91.) That same day, he provided an "Initial Review Response" to Grievance #509029 in which he stated, in relevant part:

> J-Unit Staff were interviewed in regards to the above incident[.] Staff verified that the Library cart was in disarray and inmate Ashford's copies were not on the Library Cart. Staff verified that the Librarian was contacted and the books and copies were reorganized and passed out. On 6/2/14 this Lt. verified that Inmate Ashford did receive his copies. Based on the above information this grievance is resolved[.]

(ECF No. 131-19 at 4.) Plaintiff construes Hawkinberry's response as an attempt to make it appears as though Plaintiff's copies were never on the cart and that the librarian had sent Plaintiff's copies to him on June 2 when, "in actuality," Hawkinberry "stole" the grievance papers that Plaintiff had sent to the library for copying and only printed the document out later in order to resolve the issue once Plaintiff's deadline for filing an appeal had passed. (ECF No. 130, ¶91.)

Plaintiff also asserts that his "Star" magazines once again stopped being delivered to him immediately after he filed Grievance #508476 on May 5, 2014. (ECF No. 130, ¶23.) Plaintiff notified Cpt. Workman of this fact in a request slip dated May 9, 2014, but Workman never responded. (ECF No. 130, ¶¶24, 55; ECF No. 131-10 at 8.) Plaintiff subsequently sent a request slip to the mail room seeking information about his magazines, and the mail room attendant confirmed that Plaintiff's magazines were being forwarded to him as soon as they arrived. (ECF No. 130, ¶¶25, 56; ECF No. 131-10 at 9.) Plaintiff also wrote the magazine company, which

confirmed that his magazines were being sent to the prison and none had been returned as non-deliverable.  (ECF No. 10, ¶¶26, 56; ECF No. 131-10 at 11.)

After many unsuccessful attempts to get the problem resolved, Plaintiff filed a grievance on the matter ("Grievance #510183) on May 19, 2014.  (ECF No. 130, ¶27; ECF No. 131-10 at 2.)  Plaintiff's grievance noted that he had spoken to Sgt. Tanner "numerous times" about the issue, as well as a "host of officers that were passing the mail out."  (ECF No. 131-10 at 2.)  He had also spoken and written to Captain Workman about the issue, to no avail.  (*Id.*).  Plaintiff claims that, after filing Grievance #510183, his magazines began arriving again the following week.  (ECF No. 130, ¶59.)

About a month later, however, on June 25, 2014, C.O. Godines was passing out mail and stopped by Plaintiff's cell.  (ECF No. 130, ¶¶28, 60.)  While he stood there, Plaintiff noticed that he had a "Star" magazine in his hand with Plaintiff's name on it.  According to Plaintiff, Godines refused to give him the magazine and left the pod with it.  (*Id.*)  When Plaintiff spoke to Sgt. Tanner about the incident, Tanner allegedly remarked that "stuff comes up missing when you file grievances on staff."  (ECF No. 130, ¶¶28, 60; ECF No. 131-11.)

### 2. *Defendants' Version of Events*

In support of their cross-motion for summary judgment, Defendants have supplied copies of Plaintiff's grievances and their own responses thereto (ECF Nos. 139-1, 139-4, and 139-5), as well as a copy of Plaintiff's Inmate Cumulative Adjustment Records (ECF No. 139-6).  Defendants also rely on declarations from Richter, Halley, Cotton, and Parker (ECF Nos. 139-2, 139-3, 139-7, and 139-8) to rebut Plaintiffs' allegations concerning the restriction of his yard privileges, the publication of his grievance, the misappropriation of his magazines, and the problems with his toilet.

To begin, Defendants deny that Plaintiff was ever restricted from yard activities on an individualized basis or for retaliatory reasons.  (ECF No. 139-2, ¶10; ECF No. 139-3, ¶¶4-5.) Defendants maintain that, if yard activity is cancelled by the shift commander, then it is cancelled with respect to all inmates, not just a select few.  (ECF No. 139-2, ¶¶11-12; ECF No. 139-3, ¶¶8-9.)  Inmates in the RHU, like Plaintiff, are given an opportunity to sign up for yard every morning.  (ECF No. 139-2, ¶9; ECF No. 139-3, ¶7.)  When the time for yard activity comes, officers ask each inmate whether he wants to participate.  (*Id*.)  If an inmate signed up for yard and wants to participate, he is given an opportunity to go outside; if he chooses not to participate, however, he is not forced to go.  (*Id*.)

Defendants also deny the allegation that Ms. Cotton ever allowed Officer Dongilli to read Plaintiff's grievance.  They maintain that, as a matter of policy, grievances are placed in a locked box on the RHU block; they are retrieved by the grievance clerk and then delivered to the grievance coordinator without being read to or by anyone.  (ECF No. 139-3, ¶10; ECF No. 139-7, ¶¶2, 5.)  When Ms. Cotton was the grievance clerk, she would be escorted by an officer as she retrieved grievances from the RHU.  She was the only person with a key to open the locked box where the grievances were stored.  (ECF No. 139-7, ¶¶3-4.)  Defendants deny that Ms. Cotton ever discussed anyone's grievances with Officer Dongilli or with any other officer who escorted her around the RHU.  (ECF No. 139-3, ¶12; ECF No. 139-7, ¶¶5, 7.)

Defendants deny any involvement in improperly withholding Plaintiff's mail or magazines.  (ECF No. 139-8, ¶¶ 4-5.)  Moreover, they deny any awareness that Plaintiff was experiencing problems with his magazines.  (ECF No. 139-5.)  As a general policy, if mail is received by the institution and cleared to be delivered to an inmate, it is delivered to the inmate that same day.  (ECF No. 139-8, ¶ 6.)  According to Lt. Parker, none of the officers who were

involved in handling Plaintiff's mail on the 2 p.m. to 10 p.m. shift were aware of his previously-filed grievances or withheld mail from him. (*Id.*, ¶8.)

With regard to Plaintiff's plumbing issues, Defendants acknowledge that Plaintiff reported a broken toilet on May 2, 2014. (ECF No. 139-1.) They maintain, however, that officers reset the toilet that same day, after which it functioned properly. (*Id.*) Defendants further assert that Plaintiff's only other complaint about his toilet occurred on May 5, when Plaintiff notified Sgt. Richter that his toilet was clogged. (ECF No. 131-18; ECF No. 139-2, ¶3.) Richter submitted a work order to have the issue addressed, and it was fixed the following day. (ECF No.139-2, ¶¶4-5.) Defendants insist that, given the routine nature of the problems that Plaintiff was experiencing with his toilet, there was never any need to transfer him to another cell. (ECF No. 139-2, ¶8.)

### B. Procedural Background

Plaintiff commenced this litigation on December 19, 2014, with the filing of a motion for leave to proceed *in forma pauperis* (ECF No. 1). Plaintiff's motion was granted on December 23, 2014 (ECF No. 2), and his complaint (ECF No. 3) was filed that same day. By orders dated September 4, 2015 (ECF No. 52) and September 18, 2015 (ECF No. 58), Plaintiff was permitted to make certain amendments to the complaint. Subsequently, in a Memorandum Opinion and Order dated June 2, 2016, this Court dismissed some of the claims asserted in the complaint. (*See* ECF Nos. 79 and 80.)

At this juncture, the following claims remain: (i) an Eighth Amendment claim for allegedly unconstitutional conditions of confinement (Compl. ¶162); (ii) an Eighth Amendment claim predicated on the denial of exercise (Compl. ¶164); (iii) an Eighth Amendment claim predicated upon Cotton's alleged "deliberate indifference" to Plaintiff's safety when she failed to

keep his grievance confidential (Compl. ¶156); (iv) various First Amendment claims predicated on the alleged retaliation against Plaintiff after he engaged in protected activity (Compl. ¶¶157-60); (v) a claim for alleged conspiracy to violate Plaintiff's federal constitutional rights (Compl. ¶167); and (vi) a common law negligence claim arising from Plaintiff's injury in the RHU yard (Compl. ¶¶153-56).[4]

The parties have filed cross-motions for summary judgment, and supporting materials, with respect to all remaining claims. (ECF Nos. 128, 129, 130, 131, 135, 136, 137, 138, 139, 141, 142, 143.) As a result of these filings, the parties' motions are ripe for resolution. The Court's analysis follows.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health System v. Metropolitan Live Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c) and (e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989) (the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to

---

[4] Plaintiff has also asserted a "claim" for "supervisory liability" on the part of Workman, Hawkinberry, and Parker. (*See* Compl. ¶¶165-66, ECF No. 3.) Because supervisory liability is a theory of liability rather than an independent cause of action, the court will address the Defendants' supervisory liability, if any, in the context of Plaintiff's substantive §1983 claims. To the extent Plaintiff asserts a separate claim against Workman for his alleged "failure to protect" Plaintiff, the Court deems this claim to be duplicative of Plaintiff's other "supervisory liability" claims, as it is predicated on Workman's alleged "failure . . . in all instances, to intervene after having knowledge of the wrongdoings by his staff, [which] made him deliberately indifferent in his failure to protect." (ECF No. 3, ¶155.)

defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e. depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322; *see Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Garcia v. Kimmell*, 381 F. App'x 211, 213 (3d Cir. 2010) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

## IV. DISCUSSION

### A. Plaintiff's Federal Claims

Plaintiff's federal claims are asserted pursuant to 42 U.S.C. §1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal

statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n. 9 (1999) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). To state a claim under section 1983, a plaintiff is required to show that an individual acting under color of state law violated the plaintiff's constitutional rights or statutory rights. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct; it "cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs," which "can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207-08. Thus, supervisors may be liable if they personally "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in a subordinate's unconstitutional conduct. *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)(citation omitted). "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Id.* (citations omitted).

A state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prisoner's complaint or an official grievance, does not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct. *See Rode*, 845 F.2d at 1207-08 (concluding that after-the-fact review of a grievance is insufficient to demonstrate the actual knowledge necessary to establish personal involvement); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006); *see also Croom v. Wagner*, No. 06-1431, 2006 WL 2619794, at *4 (E.D. Pa. Sept. 11, 2006) (holding that neither

the filing of a grievance nor an appeal of a grievance is sufficient to impose knowledge of any wrongdoing); *Ramos v. Pa. Dep't of Corr.*, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement).

### 1. Plaintiff's Eighth Amendment Claim Premised on a Non-Functioning Toilet

Under the Eighth Amendment to the U.S. Constitution, individuals are protected against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This protection, enforced against the states through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement. In this regard, "prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

Not every injury raises constitutional concerns. A prison official violates the Eighth Amendment only when two requirements are met. The inmate must show that: 1) he suffered a risk of "serious" harm; and 2) prison officials showed "deliberate indifference" to such risk. *Farmer*, 511 U.S. at 834. The first element is satisfied when the alleged "punishment" is "objectively sufficiently serious." *Id.* In determining whether a prisoner has alleged a risk that is objectively serious, a court must consider not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

The second criterion, deliberate indifference, requires an inmate to show that the prison official had a sufficiently culpable state of mind. The Supreme Court clarified this deliberate indifference standard in *Farmer* as follows:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.... But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-838 (internal citations omitted).

In his complaint, Plaintiff alleges that Defendants Hawkinberry, Pletcher, DiSalva, Egros, Pellis, Garland, Dongilli, Friend, and Richter violated his Eighth Amendment rights by depriving him of a functioning toilet for five days and by not moving him to a different cell, despite the fact that his toilet was full of excrement, emitting a foul odor and attracting insects. Plaintiff contends that the lack of access to a functioning toilet caused him to limit his intake of fluids and food during the time period in question, leading to dehydration, stomach pains, and lightheadedness. In addition to suing the aforementioned Defendants, Plaintiff appears to assert supervisory liability claims against Parker and Workman relative to the conditions of his confinement.

Defendants assert that no Eighth Amendment violation can be demonstrated because Plaintiff's complaints were promptly addressed and the problem with his toilet was remedied, making it unnecessary for Plaintiff to be transferred to another cell. According to Defendants, Plaintiff reported a broken toilet on May 2, 2014, on which date the officers reset the toilet, and

it began working.  Defendants deny any further issues until May 5, 2014, when they say Plaintiff

notified Sgt. Richter that his toilet was clogged.  That same date, Richter submitted a work order

to have the plumbing issue addressed, and the toilet was fixed the following day.  According to

Defendants, there was no need to transfer Plaintiff to a different cell because his plumbing issues

presently only routine problems which were promptly addressed and they never posed a threat to

his health and safety.  In moving for summary judgment, Defendants analogize this case to

*Ridgeway v. Guyton,* No. 13-1254, 2015 WL 877778, (W.D. Pa. Mar. 2, 2015), wherein the court

ruled that "confinement in a cell for up to thirty days with a toilet that 'often' backs up is

insufficient to state an Eighth Amendment claim."  *Id.* at *6 (citing *Burkholder v. Newton,* 116 F.

App'x 35, 363 (3d Cir. 2004)).

This Court previously determined that Plaintiff's allegations concerning the ongoing

problems with his toilet were sufficient to state a §1983 claim based on allegedly

unconstitutional conditions of confinement.  *See* ECF No. 79 at 11-14.  In so doing, the Court

considered the Defendants' reliance on *Ridgeway*, which was cited in their brief supporting their

motion to dismiss.  (*See* Br. Supp. Defs.' Mot. Dismiss at 7, ECF No. 66.)  The Court implicitly

rejected Defendants' argument that the ruling in *Ridgeway* requires a dismissal of Plaintiff's

Eighth Amendment conditions of confinement claim.  Rather, the Court observed that

> the denial of access to a lavatory has been found to violate the Eighth Amendment
> "where it is unconscionably long or where it constitutes an ongoing feature of an
> inmate's confinement."  *Cook v. Wetzel,* No. Civ. A. 13-6575, 2015 WL 2395390,
> at *5 (E.D. Pa. May 20, 2015).  The lack of access to restroom facilities violates
> the Eighth Amendment where it compromises the psychological or physical
> health of the inmate.  *Young v. Quinlan,* 960 F.2d 351, 365 (3d Cir. 1992).
>
> Here, we find that Plaintiff has stated an Eighth Amendment claim for
> Defendants' failure to provide him with adequate access to a working toilet for
> five days and subjecting him to unsanitary living conditions for that period of
> time by forcing him to remain in a cell with raw sewage and swarming insects
> after Plaintiff repeatedly reported the problem to countless prison officials over
> the five days, asked to be moved to one of the five empty cells on the unit and

submitted multiple unanswered grievances on the matter. What is more, Plaintiff was forced to endure these conditions for 23 hours a day, as he was confined to his cell in the RHU, and alleges that he limited his intake of food and water for five days to prevent himself from having to use the toilet. Such a practice is a danger to Plaintiff's health, dignity and hygiene. Plaintiff's allegations are in line with other cases that have found the denial of the access to restroom facilities and unsanitary living conditions violated the Eighth Amendment.

* * *

Mem. Op. at 12 (ECF No. 79.)

Based on the record at hand, it is evident that disputed issues of fact exist with Plaintiff's Eighth Amendment claim, making an entry of summary judgment inappropriate as to most of the Defendants named in the complaint. Fundamentally, Plaintiff claims he was subjected to increasingly unsanitary conditions of confinement – and a corresponding lack of adequate toileting facilities – over the course of a five-day period, whereas Defendants contend that Plaintiff's plumbing issues involved only two discreet incidents, both of which were promptly and adequately resolved. This factual discrepancy will have to be resolved by a jury at time of trial.

Of course, plaintiff must still show that each of the officers he has sued was personally involved in the alleged constitutional deprivation. *See Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005) ("In order to prevail on a § 1983 claim against multiple defendants, a plaintiff must show that each individual defendant violated his constitutional rights."); *Rode v. Dellacriprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (noting that each defendant "must have personal involvement in the alleged wrongdoing"). Here, Plaintiff has not shown personal involvement on the part of Hawkinberry. At most, the evidence shows that Plaintiff sent Hawkinberry a request slip about his broken toilet on May 2, 2014 and never heard back. "A defendant's failure to respond favorably to a request slip, however, does not amount to personal involvement within the context of § 1983." *Kokinda v. Pa. Dep't of Corr.*, No. 2:16cv1457, 2017

WL 4049255, at *4 (W.D. Pa. Aug. 29, 2017) (citing *Rode*, 845 F.2d at 1208; *Mincy v. Chmielwski*, 508 F. App'x 99, 104 (3d Cir. 2014); *Pressley v. Beard*, 266 F. App'x 216, 218 (3d Cir. 2008)), *report and recommendation adopted*, 2017 WL 4046347 (W.D. Pa. Sept. 12, 2017). Accordingly, the Court will enter summary judgment in favor of Hawkinberry.

In addition, the Court will enter a grant of summary judgment in favor of Richter. Here, Plaintiff's own declaration establishes that Richter was first notified of the problems with Plaintiff's toilet on May 5, 2014. (ECF No. 130, ¶35.) That same day, Richter completed a work order to have the problem addressed and submitted the work order to Captain Workman for approval. (ECF No. 131-18.) Plaintiff faults Richter for refusing to move him to a different cell in the interim and for failing to assign the work order a higher priority code. In this Court's estimation, however, no reasonable jury could find that Richter was deliberately indifferent to Plaintiff's health or safety under these circumstances. Accordingly, the Court will grant the Defendants' motion for summary judgment insofar as it relates to the claim against Richter.

To the extent Plaintiff is asserting a supervisory liability claim against Workman, the claim fails as a matter of law. Workman's only involvement was his approval of Richter's work order on the same day that Plaintiff sent Workman a request slip informing him about the problems with his toilet. Plaintiff complains that Workman did not respond to his request slip but, as noted, a defendant's failure to respond to a request slip does not amount to personal involvement within the context of § 1983. *Kokinda,* 2017 WL 4049255, at *4. In any event, Workman's approval of Richter's work slip on the same day that he was notified of the plumbing problem precludes a finding that he was deliberately indifferent to Plaintiff's health or safety. Summary judgment will therefore be entered in favor of Workman on the conditions of confinement claim.

Similarly, to the extent Plaintiff is asserting a supervisory liability claim against Parker, the claim fails as a matter of law. Here, Parker's alleged misconduct stems from his submission of an Initial Review Response to Grievance #508476, in which he allegedly fabricated facts to cover up the unconstitutional conditions of Plaintiff's confinement. (ECF No. 130, ¶72; ECF No. 131-12 at 4.) Parker's only other conduct involved his alleged attempts to discourage officers from answering Plaintiff's request slips, which occurred well after the plumbing issue had been resolved. As a matter of law, Parker's alleged actions, even if proven, are insufficient to establish his personal involvement in the underlying constitutional violation. *See Alexander v. Gennarini,* 144 F. App'x 924, 925 (3d Cir. 2005)(defendant's involvement in post-incident grievance process does not establish a basis for §1983 liability); *Kruge v. Johnston,* No. 3:14-cv-192, 2015 WL 3609927, at *5 (W.D. Pa. June 8, 2015) ("[A]ny attempt by Plaintiff to establish liability against the Warden and Deputy Warden solely based upon their substance or lack of response to his institutional grievances does not by itself support a constitutional claim."). Accordingly, the Defendants' motion will be granted insofar as it relates to the claim against Parker.

As to the remaining Defendants – i.e., Pletcher, DiSalva, Egros, Pellis, Garland, Dongilli, and Friend -- Plaintiff has produced sufficient evidence of personal involvement on their part for purposes of withstanding summary judgment. Accordingly, the claims against these seven Defendants will proceed to trial.

### 2. *Plaintiff's Eighth Amendment Claim Premised on the Denial of Exercise*

Plaintiff asserts a separate Eighth Amendment claim predicated on the theory that Defendants Hawkinberry and Richter subjected him to "cruel and unusual punishment" by depriving him of exercise for a period of twenty-one (21) days. (ECF No. 130, ¶¶13-17.) Based

on the sworn declarations of Halley and Richter (ECF Nos. 139-2 and 139-3), Defendants deny that Plaintiff was ever restricted from participation in yard activity on an individualized basis. (*Id.*)  Although this conflict might normally present a genuinely disputed issue of fact, in this case, the Court finds that the dispute is not material.  That is because this Court is independently obligated, pursuant to 28 U.S.C. §1915(e)(2)(B) and §1915A, to determine the sufficiency of Plaintiff's claims and, based on the facts he has alleged, his Eighth Amendment "denial of exercise" claim fails to state a cause of action for which relief can be granted.

To establish an Eighth Amendment violation based on the denial of exercise, a prisoner "must demonstrate that such a denial is sufficiently serious to deprive [him] of the minimal civilized measure of life's necessities."  *Gattis v. Phelps*, 344 F. App'x 801, 805 (3d Cir. 2009) (determining that the prisoner "was not guaranteed outdoor exercise at all times" and the limitation of exercise to three (3) days per week was insufficiently serious to implicate the Eighth Amendment).  Although "meaningful recreation is extremely important to the psychological and physical well-being of the inmates," *Peterkin v. Jeffes*, 855 F.2d 1021, 1031 (3d Cir. 1988) (internal quotation marks and citation omitted), the "lack of [an] opportunity to exercise can only rise to a constitutional level 'where movement is denied and muscles are allowed to atrophy, [and] the health of the individual is threatened.'"  *Dickens v. Danberg*, Civ. No. 10–786, 2012 WL 2089516, at *6 (D. Del. June 8, 2012) (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)).

Here, Plaintiff has not alleged, much less proved, any type of physical injury or a serious threat to his health as the result of the alleged 21-day deprivation of access to the yard.  As such, his Eighth Amendment claim predicated on denial of exercise fails to state a viable claim for relief and must be dismissed.  *See Jordan v. Rowley,* Civil No. 1:16-cv-1261, 2017 WL 2813294,

at *3 (M.D. Pa. June 29, 2017) (prisoner failed to state an Eighth Amendment claim based on allegations that he had been denied outdoor exercise, recreation, and fresh air during a period of six months); *Dickens*, 2012 WL 2089516, at *6 (dismissing Eighth Amendment claim as frivolous where plaintiff alleged he was deprived of exercise for three months but did not allege any tangible physical harm resulting from his lack of exercise); *Illes v. Deparlos*, Civil No. 1:09-cv-1166, 2012 WL 86938, at *3 (M.D. Pa. Jan. 11, 2012) (finding "insufficient evidence to support an inference of deliberate indifference to a substantial risk of serious harm" where the prisoner was allegedly denied out-of-cell exercise for twenty-eight (28) consecutive days). Plaintiff's Eighth Amendment claim predicated on his alleged deprivation of exercise will be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B) and §1915A.[5]

### 3. *Plaintiff's Deliberate Indifference Claim Against Cotton*

Plaintiff alleges in his complaint that Cotton's failure to keep his grievance confidential until its official filing made her "deliberately indifferent to [P]laintiff's safety, in that she was in violation of prison rules and safety codes." (ECF No. 3, ¶156.) To the extent Plaintiff is attempting to establish an Eighth Amendment violation on the part of Cotton, the claim fails as a matter of law. Assuming, as we must, that Cotton did in fact allow Dongilli to read Plaintiff's grievance, the Court concludes that such conduct is insufficient to establish either: (i) that the breach of confidence created a risk of serious harm to Plaintiff or (ii) that Cotton was subjectively aware of, and deliberately indifferent to, such a risk. The fact that Cotton's alleged actions may have violated SCI-Fayette's internal policies is of no legal moment, because "the

---

[5] Although Plaintiff's allegations are insufficient to state an Eighth Amendment claim predicated upon a denial of exercise, the Court will still consider the allegations as they relate to Plaintiff's claim for alleged retaliation, since the two claims are governed by different legal standards. *See Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000) ("Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.") (internal quotation marks and citation omitted). The Court will discuss the First Amendment retaliation claim below.

failure to comply with prison policies and regulations does not amount to a Constitutional violation." *Meekins v. Beard,* No. CIV. 3:CV-06-290, 2008 WL 647738, at *6 (M.D. Pa. Mar. 5, 2008) (citing authority). In sum, the evidence of record, even when construed most favorably to Plaintiff, fails to state a viable §1983 claim against Cotton, making a grant of summary judgment in her favor appropriate.

### 4. *Plaintiff's First Amendment Retaliation Claims*

Plaintiff alleges in his complaint that various prison officials retaliated against him in a number of ways after he filed his grievances. The alleged retaliation involved prison staff: (a) denying Plaintiff access to yard activities; (b) subjecting Plaintiff to unsanitary conditions after his toilet stopped working; (c) misappropriating grievance materials that Plaintiff had sent to the library for copying on May 5, 2014; and (d) improperly withholding Plaintiff's magazines.

It is well established that "[r]etaliating against a prisoner for the exercise of his constitutional rights is unconstitutional." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012) (citations omitted). "To state a claim for retaliation, a plaintiff must allege that: (1) he was engaged in constitutionally protected conduct, (2) he suffered some adverse action at the hands of the prison officials[,] and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that action." *Id.* (internal quotation marks and citation omitted). If a prisoner shows the three retaliation elements, prison officials "may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn,* 241 F.3d 330, 333-34 (3d Cir. 2001).

For purposes of establishing the first element, it is clear that the use of a prison grievance system qualifies as protected activity. *See, e.g., Pepe v. Lamas*, 679 F. App'x 173, 175–76 (3d

Cir. 2017) (concluding that plaintiff stated a plausible First Amendment claim where he alleged that defendants removed him from his job in the prison kitchen in retaliation for filing a grievance); *Burgos v. City of Phila.,* --- F. Supp. 3d ---, 2017 WL 3917620, at * (E.D. Pa. Sept. 6, 2017) (Plaintiff could state a plausible First Amendment violation by alleging that his repeated complaints, lodged through prison grievance system, resulted in prison officials returning him to a three-person cell). Here it is undisputed that Plaintiff filed a number of grievances while incarcerated at SCI-Fayette. He has therefore established the first element of his First Amendment claim as a matter of law.

The second element of a retaliation claim requires Plaintiff to establish that he suffered some adverse action at the hands of the prison officials. *Bistrian,* 696 F.3d at 376. An adverse action is one that is sufficient "to deter a person of ordinary firmness from exercising his First Amendment rights." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (internal quotation marks and citation omitted)). "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Id.* at 224 (internal quotation marks and citation omitted). The retaliatory conduct "need not be great in order to be actionable" but must be "more than de minimus." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotations and emphasis omitted).

In this case, each of the retaliatory acts alleged by Plaintiff – if proven – might well be sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and Defendants do not contend otherwise. To the extent the Defendants dispute the second element of Plaintiff's retaliation claims, they deny having engaged in the type of conduct alleged or they

dispute Plaintiff's ability to demonstrate personal involvement on the part of the Defendants who have been sued.

To prove the third element -- that a protected activity was a substantial or motivating factor in an alleged retaliatory action, a plaintiff must show "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). Importantly, however, "'[t]hese are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 280 (3d Cir. 2000) (quoting *Kachmar v. SunGard Data Sys., Inc*., 109 F.3d 173, 177 (3d Cir. 1997)).

Here, the Defendants deny subjecting Plaintiff to adverse action and further deny that they acted with a retaliatory motive. The Court will address each aspect of Plaintiff's retaliation claims separately.

### a. Denial of Yard Activity

In his complaint, Plaintiff alleges that Hawkinberry and Richter retaliated against him for filing Grievance #497654 by denying him access to the prison yard. (ECF No. 3, ¶157.) In support of this claim, Plaintiff has adduced evidence indicating that: (i) he filed Grievance #497654 (pertaining to his injury in the yard) on February 18, 2014, naming fellow inmate Timothy Gaines as a witness (ECF No. 130, ¶11; ECF No. 131-6 at 2); (ii) later that morning, Cotton retrieved the grievance and permitted Dongilli to read it (ECF No. 130, ¶12); (iii) within fifteen minutes thereafter, Officer Halley recited portions of the grievance to Plaintiff and remarked that Plaintiff should not have put a grievance in about the yard and "would not be going to the yard for a while" (ECF No. 130, ¶¶13, 45); (iv) the next morning, Defendant

Richter, while drawing up the yard list, told Plaintiff he "might as well lay [sic] down because [he]was not going outside for a while" (ECF No. 130, ¶¶14, 46); (v) shortly thereafter, Hawkinberry, who was running yard movement with Richter, made a similar remark, telling Plaintiff that he would not be "going to the yard for a while," adding that Plaintiff "might hurt [his] back again" (ECF No. 130, ¶¶ 14, 48); (vi) Hawkinberry also precluded Inmate Gaines from participating in yard activity that day, allegedly because he was listed as a witness in Grievance # 497654 (ECF No. 130, ¶14); and (vii) Richter and Hawkinberry, along with other officers, continued this pattern over the course of the next several weeks (ECF No. 130, ¶¶16, 48). In addition to his own declaration, Plaintiff has submitted sworn statements from Inmates Timothy Gaines, Wesley McKenney, and Daryl Johnson, all of whom generally corroborate Plaintiff's account. (ECF Nos. 131-4, 131-7, and 131-8.) Notably, Inmate McKenney claims that, when Richter denied Plaintiff access to the yard on February 19, 2014, he told Plaintiff to "put another grievance in because you're not going out." (ECF No. 131-8.)

Defendants dispute the second and third elements of Plaintiff's retaliation claim. With regard to the "adverse action" element, they deny that Hawkinberry or Richter ever precluded Plaintiff from participating in yard activities. As set forth in the declarations of Richter and Halley, it is standard policy in the RHU to allow inmates like Ashford to decide for themselves whether they want to participate in yard activity on any given day. (ECF No. 139-2, ¶9; ECF No. 139-3, ¶7.) Defendants maintain that, if Plaintiff did not participate in yard activity, it was either due to inclement weather – in which case the shift commander would have cancelled yard activity for all inmates -- or due to Plaintiff's own personal decision not to participate. (ECF No. 139-2, ¶¶9-12; ECF No. 13-3, ¶¶7-9.)

Defendants also dispute the third element of Plaintiff's retaliation claim. To that end, they have submitted evidence of standard RHU policy concerning the confidentiality of grievances. As set forth in the declarations of Halley and Cotton, inmates in the RHU who wish to file a grievance hand their grievances to the officers on the pod and the officers place the grievances in a locked box. (ECF No. 139-3, ¶10.) The only person with a key to the box is someone from the front office who is escorted by an officer to retrieve the grievances on a daily basis. (ECF No. 139-3, ¶10.) During times relevant to this litigation, that person was Cotton. (ECF No. 139-7, ¶¶2-4.) Cotton denies ever reading inmate grievances, discussing them, or showing them to corrections officers during her time as a grievance clerk. (ECF No. 139-7, ¶¶5, 7.) She claims she knew nothing about Grievance #497654 prior to reading the complaint in this litigation. (*Id.* ¶6.) Halley similarly denies ever seeing Cotton read inmate grievances or discuss them with anyone. (ECF No. 139-3, ¶12.) He further states that he never witnessed an officer read an inmate's grievance prior to placing it in the locked box. (ECF No. 139-3, ¶11.) Halley maintains that he would have no way of knowing whether Plaintiff even wrote a grievance or what the contents were unless Plaintiff told him about it or he was interviewed about it. (ECF No. 139-3, ¶6.)

In this case, the evidence gives rise to competing conclusions about whether Defendants Richter or Hawkinberry restricted Plaintiff's yard privileges and/or whether they did so for retaliatory reasons, as Plaintiff claims. This Court, however, may not weigh evidence, determine credibility, or resolve factual disputes at the summary judgment stage. *See Anderson,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.") Consequently, neither party is entitled

to an entry of summary judgment with respect to this aspect of Plaintiff's First Amendment retaliation claim.

    b.  <u>Refusal to Address the Problem with Plaintiff's Toilet</u>

  Plaintiff alleges that Officers Egros and Pellis retaliated against him by denying him access to a working toilet and subjecting him to unsanitary conditions in his cell. (ECF No. 3, ¶158.) Plaintiff contends that he informed both of these officers, among others, about his plumbing problems but they refused to help him address the problem and refused to move him to one of the empty cells on his block. Beyond this, the officers joked about the problems Plaintiff was having with his toilet.

  Defendants deny that the officers were inattentive to Plaintiff's problem. As discussed above, Defendants insist that Plaintiff made only two discreet reports of a plumbing issue during the time frame at issue and both times the problem was addressed in a timely manner. In addition, Defendants deny that there is any causal connection between the filing of Grievance #497654 and the conduct of which Plaintiff complains, since the latter occurred nearly three months after Grievance #497654 was filed.

  Here, the evidence establishes that Plaintiff filed Grievance #497654 on February 18, 2014 and Grievance #498217 the following day. (ECF Nos. 131-6 at 2 and 131-9 at 2.) As previously discussed, these filings constituted protected activity for purposes of the first element of Plaintiff's retaliation claim.

  Plaintiff's declaration establishes that, on May 4, 2014 he informed Pellis and Egros of the ongoing problems he was having with his toilet, but they refused to take any action to resolve the problem and also refused to move Plaintiff to an empty cell. (ECF No. 130, ¶¶32, 66.) According to Plaintiff, the officers teased him about the foul odor emanating from his cell. (*Id.*

¶¶33, 66.)  Arguably, this conduct constitutes the type of adverse action that would deter a

person of ordinary firmness from engaging in protected activity.  Consequently, even though the

Defendants may dispute whether the alleged misconduct occurred, a triable issue of fact exists

relative to the second element of Plaintiff's retaliation claim.

With respect to the third element of Plaintiff's retaliation claim, the Court finds that there

is no evidence in the record to establish that Pellis' conduct was substantially motivated by

knowledge that Plaintiff had filed grievances on February 18 and 19, 2014.  First, there is no

"unusually suggestive temporal proximity between the protected activity and the allegedly

retaliatory action."  *Watson,* 834 F.3d at 424.  Second, there is no evidence of "a pattern of

antagonism coupled with timing" that might establish a causal link.  *Id.*  Finally, the record as a

whole does not support an inference that Pellis acted with a retaliatory motive.  *See id.*

("[C]ausation, like any other fact, can be established from the evidence gleaned from the record

as a whole.").  In fact, there is no evidence in the record to establish that Pellis was personally

aware of Plaintiffs' protected activity at the time that Pellis allegedly ridiculed Plaintiff and

declined to assist him.  Accordingly, the Court will grant the Defendants' motion for summary

judgment insofar as it relates to the retaliation claim against Pellis.

The Court reaches a different result with respect to the claim against Egros.  According to

Plaintiff, Egros ridiculed him and told him to "file a grievance like I always do."  (ECF No. 130,

¶33.)  Plaintiff's account is generally corroborated by several witnesses, including Inmate

Wesley McKenney, who states that he heard Egros tell Plaintiff "to file another grievance like he

always do[es]."  (ECF No. 131-14.)  In this Court's estimation, the foregoing evidence, if

credited by a jury, would be sufficient to demonstrate that Plaintiff's protected activity was a

substantial or motivating factor in Egros' alleged misconduct.  Accordingly, summary judgment will be denied with respect to the retaliation claim against Egros.

### c. Theft of Grievance Materials

Plaintiff has also asserted retaliation claims against Officers Garland, Halley, Newman, McKnight, Pletcher and Hawkinberry based on their alleged involvement in misappropriating Plaintiff's grievance materials.  (ECF No. 3, ¶159.)  Plaintiff's claim is that he sent Grievance #498217 (and supporting documents) to the library for copying on Monday, May 5, 2014, so that the copies could be returned the following Thursday, May 8, and mailed out on May 9, 2014 in connection with Plaintiff's appeal of Grievance #498217.  Plaintiff theorizes that his copies were returned from the library to his unit on May 8, 2014, but that Garland, Halley, Newman, McKnight, and Pletcher each claimed to be unable to locate the papers and/or the library cart on which they were returned.  Plaintiff further contends that Defendant Hawkinberry offered to provide Plaintiff with copies of Grievance #498217 but then later refused to do so after Plaintiff declined to withdraw a separate grievance.

Defendants did not move for summary judgment on this claim, and their response to Plaintiff's "Statement of Undisputed Facts" suggests that they did not squarely address the matter because they did not perceive that Plaintiff's allegations related to any cause of action that was still pending.  (*See* ECF No. 135, ¶¶56-61.)  Defendants' confusion in this regard may be due to the fact that, in its prior opinion of June 2, 2016, this Court addressed the missing grievance materials primarily in the context of Plaintiff's claim that he had unlawfully been denied access to the courts.  (*See* ECF No. 79 at 14.)  The Court made only passing reference to the fact that Plaintiff had adequately stated a retaliation claim predicated on the improper confiscation of his grievance papers, and the reference was made in the context of discussing

Plaintiff's civil conspiracy claim. (*Id.* at 15.) Although the Court did not elaborate on this particular theory of retaliation, the claim is fairly set forth in the complaint (ECF No. 3, ¶159), so the Court will address it now.

In sum, after careful review of the record, the Court finds that Plaintiff's retaliation claims against Officers Garland, Halley, Newman, McKnight, and Pletcher will proceed forward because Defendants have not met their prima facie burden of demonstrating that no genuinely disputed issues of material fact exist relative to this claim. Although the claim is tenuous, it is minimally sufficient for purposes of surviving summary judgment. The first element of Plaintiff's retaliation claim is satisfied by the fact that his filing of Grievance #498217 and related appeals in that matter are constitutionally protected activity. The second and third elements hinge on Plaintiff's theory that: (a) copies of Grievance #498217 were, in fact, present on the library cart when the cart was delivered to his unit on May 8, 2014; and (b) Garland, Halley, Newman, McKnight and Pletcher were each personally aware that Plaintiff's grievance materials were available but they deliberately refused to provide the copies to Plaintiff. The evidence on this point is ambiguous, and Plaintiff's own declaration is arguably in conflict with certain aspects of the account he contemporaneously gave when he filed Grievance #509029, concerning this incident. Further, Plaintiff's assertion that his copies were available for delivery on May 8 is ultimately dependent on hearsay evidence in the form of out-of-court statements by an unidentified inmate worker and the prison librarian. The Court cannot presently make a definitive determination about whether these hearsay statements will be reducible to an admissible form of evidence at time of trial. There are also unresolved issues of fact and competing inferences concerning each Defendant's personal involvement – or lack thereof – in the alleged confiscation of Plaintiff's grievance materials. In light of these circumstances, the

Court will deny both parties' motions for summary judgment as they relate to the claims against Garland, Halley, Newman, McKnight, and Pletcher.

The Court will also deny the parties' cross-motions for summary judgment relative to Plaintiff's retaliation claim against Hawkinberry. In his sworn declaration, Plaintiff states that Hawkinberry called him to his office on May 17, 2014 and attempted at that time to persuade Plaintiff to withdraw Grievance #508476, which Plaintiff declined to do. (ECF No. 130, ¶41.) Plaintiff states that he asked Hawkinberry about the missing copies of Grievance #498217 at that time and Hawkinberry indicated he would obtain the missing copies for Plaintiff. (Id.) Four days later, however, Hawkinberry allegedly posed an ultimatum to Plaintiff, stating that, unless Plaintiff withdrew Grievance #508476, Hawkinberry would not provide the missing copies of Grievance #498217 and would make Plaintiff's life in the RHU difficult. (Id.) Plaintiff claims that he declined to withdraw Grievance #508476, and that Hawkinberry subsequently delayed delivery of the missing grievance papers until June 2, 2014 – after Plaintiff's deadline for filing an appeal for Grievance #498217 had passed. (Id., ¶¶89, 91.)

Plaintiff's claim against Hawkinberry is predicated upon sworn allegations that are inferentially contradicted by other evidence in the record and may not ultimately be credited by a jury. Nevertheless, they are sufficient for present purposes to support a retaliation claim against Hawkinberry. If credited, Plaintiff's evidence is sufficient to show that he engaged in protected activity (filing grievances and pursuing appeals thereof), that Hawkinberry undertook a course of adverse action against Plaintiff, and that Plaintiff's grievance activities were a substantial or motivating factor in the alleged misconduct. At the same time, a reasonable jury would not be compelled to return a verdict in Plaintiff's favor. Accordingly, entry of summary judgment is

inappropriate relative to the retaliation claim against Hawkinberry, and the matter will proceed to trial.

        d.  <u>Misappropriation of Plaintiff's Magazines</u>

Plaintiff has also asserted retaliation claims against Defendants Sgt. Tanner and Lt. Parker based on their alleged responsibility for the disappearance of Plaintiff's magazines. (ECF No. 3, ¶160.) As discussed, Plaintiff filed Grievance #498217 on February 19, 2014. (ECF No. 131-9.) Plaintiff attests that, for a period of about seven weeks thereafter – i.e., from February 19 to April 8, 2014, he stopped receiving a "Star" magazine that usually arrived on a weekly basis. (ECF No. 130, ¶¶ 18-19, 22.) During this period, Plaintiff talked to Tanner about the problem "multiple times" each week. (Id. ¶22.) Plaintiff confirmed during this time that the publishing company was still sending the magazines to SCI-Fayette and the mailroom was forwarding all of Plaintiff's mail to his pod. (Id. ¶¶20-21.)

Plaintiff states that, after "a lot of prodding," (ECF No. 130, ¶22), his magazines began arriving again on April 8, 2014 and continued to arrive without any problems until he filed Grievance #508476 on May 5, 2014. (Id. ¶¶22-23.) At that point, his magazines "[i]nstantly. . . began vanishing again." (Id. ¶23.) Once again, Plaintiff confirmed that the publishing company was still sending the magazines to SCI Fayette and the mail room was forwarding all of Plaintiff's mail to his pod. (Id. ¶¶25-26.) Plaintiff continued to talk to Tanner about the problem, but Tanner just "blew [Plaintiff] off." (Id. ¶57.) Eventually, Plaintiff filed a grievance (Grievance #510183) on May 19, 2014 to address this alleged retaliation. (ECF No. 113-10.) Subsequently, on June 25, 2014, Officer Godines was passing out mail when Plaintiff claims to have noticed him holding a copy of a "Star" magazine that had Plaintiff's name on it. (ECF No. 130, ¶28.) Plaintiff asserts that Godines refused to give him his magazine and left the pod with

it. When Plaintiff discussed the situation with Tanner, Tanner allegedly remarked that, "Stuff comes up missing when you file grievances on staff." (Id. ¶28.)

Based on the foregoing evidence, the Court finds that Plaintiff's retaliation claim against Sgt. Tanner is sufficient to survive summary judgment. If credited, Plaintiff's sworn statements could support a reasonable inference that Tanner knew his magazines were being misappropriated in retaliation for protected activity and that Tanner acquiesced in the misconduct.

Defendants insist that Plaintiff's retaliation claim fails as a matter of law because officers on the unit were neither aware of the alleged problems with Plaintiff's magazines, nor involved in improperly withholding the magazines. In support of their motion, Defendants have submitted a sworn declaration from Lt. Parker as well as a copy of Plaintiff's file for Grievance #510183, which includes the Initial Review Response of Lt. Parker, the Appeal Response by Defendant Coleman, and the Final Appeal Decision by the Office of Inmate Grievances and Appeals. (ECF No. 139-5; ECF No. 139-8.) As set forth therein, Lt. Parker investigated Plaintiff's grievance by interviewing all staff members involved and observing the procedures that were being used by staff to pass out mail. Lt. Parker concluded that all of the mail received on the unit was being passed out on the blocks in accordance with the facility's established policies and procedures. All of the officers that Parker interviewed denied engaging in retaliatory conduct and further denied any awareness of Plaintiff's past grievances. (ECF No. 139-5; ECF No. 139-8.) Defendants also point to internal prison records indicating that Plaintiff was interviewed by his counselor during the time frame in question and "reported no issues or concerns." (ECF No. 139-6.)

Defendants' evidence is sufficient to demonstrate the existence of genuinely disputed issues of fact relative to the retaliation claim against Tanner. At the same time, however, Defendants' evidence is not sufficient to resolve the disputed issues as a matter of law. Accordingly, both Plaintiff's and Defendants' motions will be denied relative to the retaliation claim against Tanner.

On the other hand, Defendants' motion will be granted insofar as it relates to the retaliation claim against Lt. Parker. Plaintiff appears to have named Parker as a Defendant under a theory of supervisory liability, but there is no evidence in the record to demonstrate Parker's personal involvement in the alleged misappropriation of Plaintiff's magazines. As far as this Court can tell, Parker's involvement in the matter was limited to his investigation of Grievance #510183 and his submission of an Initial Review Response. (*See* ECF No. 131-11.) Plaintiff appears to be accusing Parker of engaging in a cover-up, but Parker's involvement in the grievance process is insufficient as a matter of law to establish his personal involvement in the alleged misconduct that he was investigating. *See Kruge v. Johnston,* No. 3:14-CV-00192, 2015 WL 3609927, at *5 (W.D. Pa. June 8, 2015) ("[A]ny attempt by Plaintiff to establish liability against the Warden and Deputy Warden solely based upon their substance or lack of response to his institutional grievances does not by itself support a constitutional claim) (citing *Alexander v. Gennarini*, 144 F. App'x 924, 925 (3d Cir.2005) (involvement in post-incident grievance process not a basis for § 1983 liability)). Consequently, summary judgment will be entered in favor of Parker on this aspect of Plaintiff's retaliation claim.

To the extent Plaintiff is asserting a supervisory liability claim against Workman, it too fails as a matter of law. Plaintiff asserts that, between February 19 and April 8, 2014, he spoke with Workman on two occasions about the fact that his magazines were not being delivered.

(ECF No. 130, ¶22.)  Plaintiff claims that, "[a]fter a lot of prodding," his magazines began circulating again on April 8.  (*Id.*)  This evidence, even if credited, is too tenuous to establish knowledge on the part of Workman of an unconstitutional course of conduct and acquiescence therein.

Plaintiff states that, after he began to experience more problems with his magazines in early May, he wrote a request slip to Workman about the problem.  (ECF No. 130, ¶23; ECF No. 131-10 at 8.)  Workman never responded to the request slip.  (ECF No. 130, ¶23.)  As previously discussed, however, Workman's failure to respond to Plaintiff's request slip is an inadequate basis for inferring his personal involvement in a constitutional tort.  The Court will therefore grant the Defendants' motion insofar as it relates to Plaintiff's supervisory claim against Workman.

### 5.  *Plaintiff's Civil Conspiracy Claims*

Plaintiff also asserts a §1983 civil conspiracy claim against Hawkinberry, Parker, McKnight, and Coleman.  This claim is predicated on the theory that the aforementioned Defendants conspired to interfere with the investigations of numerous constitutional violations and thereby effectuate a cover-up of the wrongdoing.  (ECF No. 3, ¶167.)  In support of this claim, Plaintiff makes the following assertions in his "Statement of Undisputed Facts":

- "Defendant Hawkinberry fabricated the record and conspired with Defendant Richter to interfere with the investigation [of Grievance #498217] when he stated that no inmate went to yard on 2-19-14 due to weather."  (ECF No. 129, ¶20.);

- Defendants Richter and Hawkinberry retaliated against Plaintiff [and] attempted to cover it up when their rebuttal to Plaintiff's claims was that nobody went to yard on 2-19-14 (ECF No. 129, ¶21);

- Defendant Richter's sudden admission to conducting yard through Plaintiff's request for admissions is a direct reflection of he [sic] and Defendant Hawkinberry's

retaliation and conspiracy to cover it up with the aforementioned falsehoods." (ECF No. 129, ¶22.);

- Defendants Parker, Richter, and Hawkinberry again gave false responses when they said that their responses were truthful in Grievance NO. 498217." (ECF No. 129, ¶23.);

- "Defendant Parker fabricated the record and conspired to interfere with proper investigation when he said plaintiff did not sign up for medical [until] a later date." (ECF No. 129, ¶24.);

- "Defendant Parker falsified another grievance response when he said that plaintiff never spoke to anyone about [his] broken toilet." (ECF No. 129, ¶25.);

- "Defendant Coleman, at no time, reprimanded Defendant Parker for falsifying documents, but instead corrected his false reports." (ECF No. 129, ¶28);

- C.O. McKnight took Plaintiff's request slip [seeking information about the events of May 1-May 6, 2014] on June 19, 2014 and never returned it. (ECF No. 129, ¶54.)

To demonstrate the existence of a conspiracy under Section 1983, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law." *Laurensau v. Romarowics*, 528 F. App'x 136 (3d Cir. 2013) (internal citations omitted). "[A] § 1983 conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Twp. of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011); *see also Sweetman v. Borough of Norristown, PA*, 554 F. App'x 86, 90 (3d Cir. 2014) (same). "The essence of a conspiracy is an agreement." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989). "It is not enough that the end result of the parties' independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Perez v. Gamez*, 1:13-CV-1552, 2013 WL 6073877, at *9 (M.D. Pa. Nov. 18, 2013). Rather, the plaintiff must show that the defendants acted in concert with the specific intent to violate the plaintiff's rights. *Davis v. Fox*, 3:12-CV-1660, 2013 WL 5656125, at * 5 (M.D. Pa. Oct. 15,

2013).  Because direct evidence of a conspiracy is rarely available, the existence of a conspiracy may be inferred from the circumstances.  *Capogrosso v. The Supreme Court of New Je*rsey, 588 F.3d 180, 184 (3d Cir. 2009).

Importantly, however, a viable §1983 claim is not stated merely by producing evidence that individuals engaged in a conspiracy to conceal or cover up a constitutional violation after-the-fact.  *See Joseph v. Naji*, No. 1:16-CV-01870, 2017 WL 2375703, at *8 (M.D. Pa. May 16, 2017) ("'A cover-up, without more, cannot be the basis of a conspiracy claim under §1983.'") (quoting  *Epifan v. Roman*, No. 3:11-CV-02591-FLW, 2014 WL 4828606, at *7 (D.N.J. Sept. 29, 2014), *report and recommendation adopted*, No. 1:16-CV-01870, 2017 WL 2362522 (M.D. Pa. May 31, 2017).  "Rather, a plaintiff must show how the purported cover up violated his constitutional rights." *Id*. at *8 (citing *Epifan,* 2014 WL 4828606, at *6 and *Bush v. City of Phila*., No. CIV. A. 98-0994, 1999 WL 554585, at *4 (E.D. Pa. July 16, 1999) ("Cases decided in this court and elsewhere show that conspiracy by police officers to file false reports and otherwise cover up wrongdoing by fellow officers is not in and of itself a constitutional violation. It provides the basis for a § 1983 action only if it results in some constitutional harm to the plaintiff.")).

Here, Plaintiff has produced sufficient evidence from which a jury could conclude that Defendant Hawkinberry conspired with Richter to retaliate against Plaintiff for his constitutionally protected activity by denying Plaintiff access to the exercise yard.  Such a conclusion is supportable, but not compelled, in light of the disputed evidence on this point. Accordingly, both Plaintiff's and Defendants' summary judgment motions will be denied insofar as Plaintiff asserts a claim against Hawkinberry for alleged conspiracy to violate his First Amendment Rights through the retaliatory denial of yard activity.

In all other respects, Plaintiff's conspiracy claim is insufficient as a matter of law, because Plaintiff has not adduced evidence to show that Defendants Hawkinberry, Parker, McKnight, or Coleman engaged in conspiratorial activity that resulted in an independent violation of his constitutional rights. To the extent that the Defendants' alleged cover-up activities prevented Plaintiff from successfully grieving his complaints, no constitutional violation has been stated because, as this Court previously recognized, "inmates do not have a constitutionally protected right to a prison grievance system." Mem. Op. (ECF No. 79) at 14 (citing *Freeman v. Dep't of Corr.*, 447 F. App'x 385, 387 (3d Cir. 2011)). Accordingly, summary judgment will be entered in favor of Defendants Hawkinberry, Parker, McKnight, and Coleman with respect to Plaintiff's §1983 conspiracy claim to the extent it is predicated on the Defendants' alleged interference with grievance investigations or attempts to cover up prior constitutional violations.

### 6. *Plaintiff's Request for Declaratory Relief*

In his complaint, Plaintiff requested that this Court enter a declaratory judgment stating that the various named Defendants had violated his federal constitutional rights. *See* ECF No. 3 at 25-26, ¶¶(A)(1)-(A)(8). It is well recognized that an inmate's transfer or release from the facility complained of generally moots claims the inmate might have for declaratory or equitable relief. *See, e.g., Sutton v. Rasheed,* 323 F.3d 236, 248 (3d Cir. 2008); *Abdul-Akbar v. Watson,* 4 F.3d 195, 206 (3d Cir. 1993). Claims will not be mooted, however, if a challenged action is claims are not mooted when a challenged action is "(1) too short in duration 'to be fully litigated prior to its cessation or expiration'; and (2) 'there [is] a reasonable likelihood that the same complaining party would be subjected to the same action again.'" *Sutton,* 323 F.3d at 248 (quoting *Abdul-Akbar,* 4 F.3d at 206). *See also Mayon v. Wetzel*, No. 2:15-CV-1003, 2017 WL

1211626, at *3 (W.D. Pa. Apr. 3, 2017) (noting an exception to the mootness doctrine where the case presents a question that is "capable of repetition yet evading review") (citing *Cobb v. Yost*, 342 F. App'x 858, 859 (3d Cir. 2009)).

Here, nothing in the record before this Court suggests that there is a reasonable probability that Plaintiff will be returned to SCI-Fayette in the future. *Cobb,* F. App'x at 859 (3d Cir. 2009) ("Speculation that [Plaintiff] could return to prison does not overcome the mootness doctrine.") (citing *Abdul-Akbar*, 4 F.3d at 206); *Mayon,* 2017 WL 1211626, at *2-3 (prisoner's claim stemming from incidents at SCI-Pittsburgh were mooted by his transfer to another state correctional institution, and nothing in the plaintiff's pleading suggested a reasonable probability of his return to that facility). Consequently, Plaintiff's claims for a declaratory judgment are moot,[6] and will be dismissed without prejudice for that reason.[7]

### B. Plaintiff's State Law Negligence Claim

Plaintiff has also asserted a claim against Richter, Lowther, and Forte under a "failure to protect" theory, which this Court construes as a negligence claim. This claim is predicated on the Defendants' alleged negligence in subjecting Plaintiff to icy conditions in the exercise yard on January 30, 2014, which allegedly led to Plaintiff falling and injuring his knee and back.

---

[6] It is necessary for this Court to determine whether Plaintiff's claims are moot because "'a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them.'" *Njos v. Carney*, No. 3:12-CV-1375, 2017 WL 3224816, at *7 (M.D. Pa. June 21, 2017), *report and recommendation adopted*, No. 3:12-CV-01375, 2017 WL 3217690 (M.D. Pa. July 28, 2017) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975), and *citing Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993)).

[7] The Court's ruling as to mootness does not affect Plaintiff's claims for compensatory or other damages. *See Weaver v. Wilcox*, 650 F.2d 22, 27 n.13 (3d Cir. 1981) (prisoner's transfer from prison mooted claim for injunctive and declaratory relief with respect to prison conditions, but not claim for damages). Here, Plaintiff seeks to recover both compensatory and punitive damages against the named Defendants.

To the extent Plaintiff seeks to recover compensatory damages, he is required, under the Prison Litigation Reform Act, to demonstrate some physical injury in connection with any claims that are predicated on mental or emotional harm. *See* 42 U.S.C. § 1997e(e). For purposes of the instant motion, Defendants have not raised any challenge to Plaintiff's compensatory damages claims, so the Court will not address the issue at this time.

To establish a cause of action for negligence in Pennsylvania, a plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. *N.W. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir.2005); *Pittsburgh Nat'l Bank v. Perr*, 637 A.2d 334, 336 (Pa. Super. Ct. 1994). Defendants contend that they cannot be liable in negligence by virtue of the provisions of the Sovereign Immunity Act, 42 Pa. Cons. Stat. §§8521-8527.

The Pennsylvania General Assembly has enacted 1 Pa. Cons. Stat. Ann. § 2310, which provides in pertinent part:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, *and its officials and employees acting within the scope of their duties,* shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

(emphasis added). "Section 2310 thus generally 'shields Commonwealth officials and employees from civil liability for torts committed within the scope of their duties.'" *DeGroat v. Cavallaro*, No. 3:16-CV-1186, 2017 WL 2152376, at *4 (M.D. Pa. May 17, 2017) (quoting *Zion v. Nassan*, 283 F.R.D. 247, 265 (W.D. Pa. 2012)); *see also Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 681-82 (M.D. Pa. 2010) ("Sovereign immunity bars claims that are asserted against the Commonwealth, its agencies, and Commonwealth employees acting within the scope of their office or employment.") (citing 1 Pa. Cons. Stat. Ann. § 2310); *Jackson v. Nassan*, No. 2:08-cv-1054, 2009 WL 2707447, at *6 (W.D. Pa. Aug. 26, 2009) ("Even where a plaintiff asks for monetary damages against a [Commonwealth] defendant in his individual capacit[y], sovereign immunity applies.").

Here, there is no dispute that Richter, Lowther, and Forte were Commonwealth employees as of January 30, 2014, when Plaintiff slipped and fell in the RHU yard.

Nevertheless, Plaintiff disputes that they were acting within the scope of their duties during the time in question. The Court finds this argument specious.

"In order to determine whether a Commonwealth employee was acting within the scope of his or her employment, courts must consider whether the employee's conduct: (a) is of a kind and nature that the employee is employed to perform; (b) occurs substantially within the authorized time and space limits; and (c) is actuated, at least in part, by a purpose to serve the employer. *DeGroat*, 2017 WL 2152376, at *4 (citing *Natt v. Labar*, 543 A.2d 223, 225 (Pa. Commw. Ct. 1988)). Based on a consideration of these factors and the evidence submitted by Plaintiff himself, there can be no genuine dispute that Richter, Lowther, and Forte were acting within the scope of their employment at the time of Plaintiff's fall.

The question thus becomes whether the General Assembly has waived the Defendants' immunity for the type of conduct that Plaintiff has alleged. Relevantly, the General Assembly has enumerated only nine strictly construed exceptions to Pennsylvania's sovereign immunity statute. *See* 42 Pa. Cons. Stat. Ann. § 8522(b). Here, the only exception with possible relevance is the "real estate exception," which applies to claims for damages that are caused by "[a] dangerous condition of Commonwealth agency real estate." *Id.* at §8522(b)(4). "In construing the real estate exception, Pennsylvania courts have held that the 'dangerous condition must derive, originate from, or have as its source the Commonwealth realty.'" *Hall v. Southwestern Pa. Water Auth.*, 87 A.3d 998, 1000 (Pa. Commw. Ct. 2014) (quoting *Snyder v. Harmon*, 562 A.2d 307, 311 (Pa. 1989)). "The exception is strictly construed," *id.*, and "substances such as ice, snow, or debris on the real estate do not qualify . . . ." *Nardella v. Se. Pa. Transp. Auth.*, 34 A.3d 300, 305 (Pa. Cmwlth. Ct. 2011). "[T]he focus must be on whether there is proof of a defect in the real property itself." *Id.* at 304; *see Raker v. Pa. Dep't of Corr.*, 844 A.2d 659, 662 (Pa.

Cmwlth. Ct. 2004) ("For an injury to be caused by a 'dangerous condition of the real estate' and fall within the real estate exception, the actual defect or flaw in the real estate itself must cause the injury, not some substance on the real property such as ice, snow, grease, or debris, unless such substances are there because of a design or construction defect").

Here, Plaintiff has offered no evidence that his injury was a result of a defect in the Commonwealth's property, as opposed to the ice and snow itself. Accordingly, Plaintiff's negligence claim predicated on his slip and fall does not come within the parameters of the "real estate exception" to sovereign immunity. *See Mitchell v. Dep't of Corr*., No. 1844 C.D. 2016, 2017 WL 3623508, at *3 (Pa. Commw. Ct. Aug. 24, 2017) ("[B]ecause Mitchell claims that an ice patch on the sidewalk rather than the sidewalk itself caused his fall, the real estate exception does not apply."). The Defendants' summary judgment motion will be granted insofar as it relates to the negligence claim against Richter, Lowther, and Forte.

## V. CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment will be denied. Defendants' cross-motion for summary judgment will be granted in part and denied in part, as set forth herein. Pursuant to 28 U.S.C. §1915(e)(2)(B) and §1915a, the Court will dismiss Plaintiff's Eighth Amendment claim predicated on the denial of exercise. The Court will further dismiss Plaintiff's requests for declaratory relief on mootness grounds.

An appropriate Order follows.


Dated:  September 26, 2017                          By the Court,

                                                    s/Cynthia Reed Eddy
                                                    Cynthia Reed Eddy
                                                    United States Magistrate Judge

cc:     AILEAF ASHFORD
DZ-2871
SCI Forest
P.O. Box 945
Marienville, PA 16239
via U.S. First Class Mail

*Attorney for Defendants*
Yana L. Warshafsky, Esq.
via CM/ECF electronic filing